IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:19-CV-00177-GCM

| GLOBAL HOOKAH DISTRIBUTORS, INC., | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER GRANTING** |
| | ) | **MOTION TO DISMISS** |
| AVIOR, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**THIS MATTER COMES** before this Court on Defendant Avior, Inc.'s ("Defendant") Motion to Dismiss for Failure to State a Claim (Doc. No. 2). Plaintiff Global Hookah Distributors, Inc. ("Plaintiff") responded to the Motion (Doc. No. 6). Defendant submitted a reply brief (Doc. No. 7). As such, this matter is ripe for disposition.

**I.    FACTUAL BACKGROUND**

Plaintiff is a distributor of tobacco products and accessories. (Compl. ¶ 5). Defendant is a company that provides automated tax filings and other taxation services. (*Id.* ¶ 6). Defendant sells a tobacco tax compliance service, known as "Tobtax Compliance," to help tobacco companies handle transaction data, file necessary returns, and acquire needed licenses in various jurisdictions. (*Id.* ¶¶ 7-12). Defendant advertises these services on its website, stating that they, *inter alia*, "ensure tax compliance, eliminate tax errors and penalties," and help businesses "quickly expand to new regions, transaction types, or products." (*Id.* ¶¶ 49-50).

In July of 2017, Plaintiff and Defendant began discussions for Defendant to provide its tax services in the twenty-three states in which Plaintiff is licensed. (*Id.* ¶ 11). During

1

negotiations, an employee of Defendant stated that it would be able to "do license renewals for [Plaintiff], and also get[] new licenses." (*Id.* ¶ 14). The employee further said that Defendant "can renew licenses for [Plaintiff]" in states that allow it, and in those that do not, Defendant could "provide everything [Plaintiff would] need" to renew itself. (*Id.*).

On August 1, 2017, Plaintiff and Defendant entered into an agreement for one year of Defendant's Tobtax Compliance service, for which Plaintiff paid Defendant a lump sum of $10,998.87. (*Id.* ¶¶ 16-22). Plaintiff uploaded tax data into Defendant's tax software system, accessible to either party through its web account. (*Id.*). Plaintiff also granted Defendant access to various state tax and licensing online accounts in order to file Plaintiff's taxes and meet license renewal requirements. (*Id.*).

Plaintiff alleges that Defendant failed to perform the contract. It failed to timely file returns or remit payments in eight states, resulting in penalties charged to Plaintiff. (*Id.* ¶ 23-24). Defendant paid these penalties out of Plaintiff's accounts. (*Id.* ¶ 25). Defendant's failure to timely file renewals led to two states withholding Plaintiff's license, and one state terminating Plaintiff's license. (*Id.* ¶ 26). Defendant withdrew money from its account in excess of written authorizations and "in amounts inconsistent with [its] corresponding tax returns." (*Id.* ¶ 27). Defendant attempted to raise the price of its services, and then terminated its services and locked Plaintiff's accounts in July of 2018, prior to the expiration of the contract. (*Id.* ¶¶ 28-29). Closing Plaintiff's accounts left Plaintiff unable to renew its licenses or file tax returns on its own behalf, a problem it was unable to rectify by contacting Defendant. (*Id.* ¶¶ 31-39). Ultimately, Plaintiff had to contact state governments itself to rectify the issue and had to "identify another provider to perform these services in the future." (*Id.* ¶¶ 39-40).

On January 9, 2019, Plaintiff sued on four causes of action in North Carolina Superior Court: (1) breach of contract; 2) fraudulent inducement; 3) conversion; and 4) violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"). Defendant timely removed the action to this Court and filed a Rule 12(b)(6) motion challenging Plaintiff's second and fourth claims.

## II. STANDARD OF REVIEW

When faced with motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must "accept as true all well-pleaded allegations and . . .view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). The Court "assume[s] the[] veracity" of these facts, and "determine[s] whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). However, the Court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs. LLP*, 213 F.3d 175, 180 (4th Cir. 2000). The complaint must be supported by "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of a cause of action's elements, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

## III. DISCUSSION

### a. Plaintiff's Fraud in the Inducement Claim

Plaintiff sued for fraud in the inducement, claiming that Defendant willfully posted statements on its website with the intent to deceive customers and to induce it to purchase Defendant's services. It also alleges that Defendant falsely represented that it could renew Plaintiff's licenses. Defendant argues that this claim is captured in full by Plaintiff's breach of

contract claim, and thus requires a separate non-contractual duty, one that Plaintiff does not show. Additionally, Defendant argues that Plaintiff does not allege enough facts to show that it made a material misrepresentation of fact separate from puffery, that it knew its statements were false, or that it never intended to carry out the contract.

To state a claim for fraud under North Carolina law, a plaintiff must allege: (1) that the defendant made a representation of some material past or existing fact; (2) that the representation was false; (3) that the defendant knew it was false when made; (4) that the defendant intended the plaintiff to act on the assertion; (5) that the plaintiff reasonably relied on the assertion and then acted upon it; (6) and that the plaintiff was then injured. *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 374 S.E.2d 385, 391 (N.C. 1988). Rule 9(b) of the Federal Rules of Civil Procedure states that when "alleging fraud . . . a party must state with particularity the circumstances constituting fraud," but that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Plaintiff's fraud claim accompanies a breach of contract claim. To "keep open-ended tort damages from distorting contractual relations, North Carolina has recognized an 'independent tort' arising out of breach of contract only in 'carefully circumscribed' circumstances." *Broussard v. Meineke Disc. Muffler Shops, Inc*., 155 F.3d 331, 346 (4th Cir. 1998) (quoting *Strum v. Exxon Company, U.S.A.*, 15 F.3d 327, 330-31 (4th Cir. 1994)). North Carolina law requires that any asserted tort claim be "identifiable" and "distinct from the primary breach of contract claim." *Id.* "The mere failure to carry out a promise in contract . . . does not support a tort action for fraud." *Strum*, 15 F.3d at 331 (citing *Hoyle v. Bagby*, 117 S.E.2d 760, 762 (N.C. 1961)).

Thus, in North Carolina, to maintain a fraud action alongside a breach of contract, Plaintiff must show "a duty owed [it] . . . separate and distinct from any duty owed under a contract." *Lowe's Companies, Inc. v. Pac. Research Grp., Inc*., No. 5:05-CV-275, 2007 WL 1040481, at *1 (W.D.N.C. Mar. 29, 2007) (applying North Carolina law) (footnote and citations omitted). Accordingly, the allegations that Defendant failed to file Plaintiff's returns, failed to withdraw money in appropriate amounts, failed to renew Plaintiff's licenses, or failed to maintain service through the end of the contract cannot form the basis of its fraud claim, as all constitute the terms of the contract. "Something more is required." *Broussard*, 155 F.3d at 346.

Plaintiff argues that Defendant made eight specific misrepresentations of fact during negotiations that induced them to enter the contract, an act they would not have undertaken but for the misrepresentations. Defendant stated that it could "provide everything [Plaintiff would] need" to secure licenses and explained the benefits of its services on its websites, listing *inter alia*, an experienced customer support team, a cheap cloud solution, and reduced IT and tax accounting costs. (Pl.'s Br. at 7-8).

Defendant argues that these statements refer to future conduct and outcomes rather than past or present (i.e. subsisting) facts. "The general rule is that a plaintiff cannot predicate an action for fraud upon statements which are promissory in nature at the time they are made and which relate to future actions and conduct." *Forstmann v. Culp*, 648 F. Supp. 1379, 1386 (M.D.N.C. 1986) (citing *Pierce v. Am. Fidelity Fire Ins. Co*., 83 S.E.2d 493 (N.C. 1954)). *See also Nat'l Cash Register Co. v. Townsend Grocery Store*, 50 S.E. 306, 307 (N.C. 1905) ("The law will not give relief unless the misrepresentation be of a subsisting fact.") (citation omitted). Promises looking to the future are "on par with false affirmations and opinions . . . and do not generally constitute legal fraud." *Id.*

Defendant's statements that it could provide Plaintiff with everything it needs to secure licenses constitute unactionable future promises. Generally, if statements can be interpreted as predicting or promising some outcome, courts have held them as immaterial. *See Nat'l Cash Register Co.*, 50 S.E. at 307 (noting that statements representing "what the vendee can do with the property, how much he can make on it, and . . . how much he can save by the use of it," are unactionable future promises); *McCormick v. Jackson*, 183 S.E. 369, 370 (N.C. 1936) (noting that statements "such as to what an agent . . . can do with property, how much he can make on it, or what he can gain by handling it" are unactionable future promises). Plaintiff concedes that Defendant represented that it could provide the things that Plaintiff "*would* need . . . throughout the *next year*." (Compl. ¶ 15) (emphasis added). It is clear that the statement constituted Defendant's belief that it would be able to carry out the contractual obligations throughout the contractual term.

Beyond that, Plaintiff does not identify any statement of demonstrable fact by Defendant as to its staffing procedures, its ability to debug the service, its technological capacity,[1] or the expertise of its workforce.[2] Instead, Plaintiff points to general statements that represent what Defendant believes to be the ultimate *future* outcome of using its services, like reduced errors and IT costs. Merely entering into the contract does not mean that Defendant *implicitly* represented the facts alleged and that failure to ultimately perform constituted fraud. Such a contention does not coincide with North Carolina's express warning about carefully delineating breaches of contract and tort claims. *See Broussard*, 155 F.3d at 346. Fraud cannot be predicated

---

[1] Defendant represented that it offers a "[c]loud solution," a point that does not appear to be in contention. (Compl. ¶ 49).

[2] Defendant represented that it offers an "[e]xperienced and dedicated customer support team." (Compl. ¶ 49). Although Plaintiff appears to take issue with the number of employees hired and their lack of expertise, no allegations in the Complaint contest that Defendant's support staff is experienced or dedicated, the precise representation made.

6

on Defendant's poor calculation of its capabilities. *See Strum*, 15 F.3d at 331 ("[M]isjudgment alone is not fraudulent inducement."). Absent any specific factual representations as to those capabilities, this assertion cannot support Plaintiff's fraud claim.

The Court is also unconvinced that Defendant's website statements constitute material representations of fact, as opposed to mere puffery. Puffery is language that includes "exaggerated advertising, blustering, and boasting," or "vague" and "general claim[s] of superiority." *Verisign, Inc. v. XYZ.com LLC*, 848 F.3d 292, 302 (4th Cir. 2017) (quotations and citation omitted). Courts have held "indefinite statements of corporate optimism," to be puffery. *Plymouth Cty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 544 (M.D.N.C. 2013) (quotations and citation omitted). The line between corporate optimism and material statements falls where "the statements at issue were 'specific factual allegations' that were 'not simply sales pitches but rather can be proven true or false – and, if properly supported, could be found material by a reasonable jury.'" *In re Lab. Corp. of Am. Holdings Sec. Litig.*, No. 1:03CV591, 2006 WL 1367428, at *9 (M.D.N.C. May 18, 2006) (quoting *Dunn v. Borta*, 369 F.3d 421, 431 (4th Cir. 2004)).

The contrast between statements that have been held puffery and those that have not is informative. In *Dunn*, the court found statements representing the exact number of units sold, the specific time the product would be introduced, or the existence of outside negotiations with specific firms to be material representations, rather than mere puffery. 369 F.3d at 431. By comparison, in *Solum v. Certainteed Corp.*, the court found that representations that the defendant's craftsmen had a "high level of knowledge and ability," and held a "highly prestigious" designation only available after a "rigorous course" to be puffery upon which no reasonable person could rely. 147 F. Supp. 3d 404, 413 (E.D.N.C. 2015). *See also Raab v. Gen.*

7

*Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) (holding a statement of an "expected annual growth rate of 10% to 30%" to be puffery); *Johnson v. Pozen Inc.*, No. 1:07CV599, 2009 WL 426235, at *22 (M.D.N.C. Feb. 19, 2009), *report and recommendation adopted*, No. 1:07CV599, 2009 WL 10680297 (M.D.N.C. Sept. 29, 2009) (holding that an assertion of an "unblemished" record was mere puffery); *In re Lab. Corp. of Am. Holdings Sec. Litig.*, No. 1:03CV591, 2006 WL 1367428, at *10 (holding a statement that the defendant was "compet[ing] favorably" and was "implementing strategies" to be puffery).

Defendant's statements merely gesture to some undefined future success or end goal and make no specific guarantee or disprovable fact – each statement is in general terms. No statement of Defendant's *guarantees* that its system will eliminate any need for clients to maintain their own systems or that it eliminates any and all possible errors. Thus, the Court finds that these statements are unactionable puffery.

The North Carolina Supreme Court does not appear to have addressed the question as to whether statements that constitute "puffery" can be relied upon for fraud and UDTPA claims. However, federal courts interpreting North Carolina law have predicted that they cannot. *See Solum*, 147 F. Supp. 3d at 412 ("[T]he court predicts that the Supreme Court of North Carolina would hold that, under the [UDTPA], a person cannot reasonably rely on mere puffery."). Lower North Carolina courts have held that one may not do so. *See, e.g.*, *McKee v. James*, No. 09-CVS-3031, 2014 WL 7534078, (N.C. Super. Ct. Dec. 31, 2014) (unpublished) (holding that puffery is not actionable under the UDTPA or as common law fraud). This Court agrees with these courts and holds that puffery cannot form the basis of fraud or UDTPA claims.

Separate from these representations, if Plaintiff's fraud claim is to survive, Plaintiff must properly allege "scienter tending to show that the promisor intended to deceive and had no

8

intention of performing the promise at the time he made it." *Jenkins v. AKZO Noble Coatings, Inc.*, 35 Fed. App'x 79, 86, 2002 WL 1020698 (4th Cir. 2002) (citing *Johnson v. Phoenix Mut. Life Ins. Co.*, 266 S.E.2d 610 (N.C. 1980)). There must be evidence that the "[promisor] had a specific intent not to perform at the time a promise was made." *Norman v. Tradewinds Airlines, Inc.*, 286 F. Supp. 2d 575, 594 (M.D.N.C. 2003) (citing *Hoyle v. Bagby*, 117 S.E.2d 760, 762 (N.C. 1961)) (quotations omitted). "Thus, where a plaintiff does nothing more than assert that [a promisor] never intended to honor its obligations under [an] agreement, dismissal as a matter of law is appropriate." *Id.* (quotations omitted).

While it is true that Plaintiff is at liberty to plead "[m]alice, intent, knowledge, and other conditions of a person's mind . . . generally," Fed. R. Civ. P. 9(b), "'generally' is a relative term." *Iqbal*, 556 U.S. at 686. "Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid—though still operative—strictures of Rule 8." *Id.* at 686-87. Thus, Plaintiff must support its contention that Defendant had the specific intent to not carry out the contract with "specific, plausible facts," rather than "vague allegations." *Hayden v. Eagles Nest Outfitters, Inc.*, No. 1:17-CV-00209-MR, 2018 WL 3833504, at *7 (W.D.N.C. Aug. 13, 2018).

Several cases demonstrate the breadth of facts held sufficient. In *Wilson v. McAleer*, the plaintiff entered into a contract with the defendants to help them sell their franchise. 368 F. Supp. 2d 472 (M.D.N.C. 2005). After the defendants broke the contract and refused to pay the plaintiff's commission fee, the plaintiff sued for fraudulent inducement, claiming that the defendants never intended to honor the contract. *Id.* at 476. In denying the defendant's motion to dismiss, the court noted that the plaintiff alleged that the defendant took a lower offer than the one he managed to find for them and included illegitimate fees. *Id.* at 477. Additionally, the

plaintiff alleged that the defendants never accepted or rejected the offer he found, but shared it secretly with the eventual purchasing party, all the while representing to him that the offer was too low. *Id.* at 478. He also alleged that the defendants refused to allow him to renegotiate the offer he found or to search for other buyers if they really were unhappy with the offer. *Id.* In total, the court found that these facts provided "corroborating evidence of plaintiff's claims of fraud."[3] *Id.*

Similarly, in *Olympus Managed Health Care, Inc. v. Am. Housecall Physicians, Inc.*, the court denied a motion to dismiss a fraudulent inducement claim. 662 F. Supp. 2d 427 (W.D.N.C. 2009). In that case, the plaintiff entered into a contract to merge with the defendant, on the back of numerous representations that the merger would be consummated. *Id.* at 438. However, the plaintiff alleged that the defendants "[n]ever intended to complete the merger," and instead, only sought the contract with the plaintiff in order to "induce [the plaintiff] to disclose confidential and proprietary business information, its goodwill, its network, employees and contractors in order to organize a competing business of their own." *Id.* The court found that the plaintiff's allegation that the defendant "did not return to their core business after the merger failed and instead opened a competing concierge health care program using all the information they had obtained from [the plaintiff]" was sufficient to support, at that early stage, that the defendant did more than breach the contract and really did defraud the plaintiff. *Id.*

By contrast, in *Norman*, the court dismissed the plaintiff's fraudulent inducement claim noting that his "bald allegation" did not offer any information "beyond the mere fact that [the defendant] failed to comply with its policies" and thus did not "support the claim that [the

---

[3] It is worth noting that this case was decided prior to *Iqbal*. As such, the court found that the plaintiff's alleged facts raised the "*possibility* that [his] fraudulent inducement allegations ha[d] some merit." *Wilson*, 368 F. Supp. 2d at 478 (emphasis added). It is possible that *even more* would be required to now support the same claim.

defendant] acted . . . with specific intent to defraud." 286 F. Supp. 2d at 595. All that the plaintiff alleged was that the defendant acted in "reckless disregard" to the promises, and thus, demonstrated that they never intended to be bound. *Id.* Without any further suggestion of motive or intent on the defendant's part, the court found that a claim of fraudulent inducement was unwarranted. *Id.*

Plaintiff's factual allegations are a far cry from the extensive facts held sufficient in *Wilson* and *Olympus*. In support, Plaintiff merely alleges that because Defendant had issues with other customers in the past, it knew that its staffing and systems were inadequate to "eliminate errors," and thus that any representation to the contrary on its website in hopes of securing new contracts was necessarily fraudulent inducement. (Pl.'s Br. at 9). It does not allege any facts to show that these past errors were of a similar mold to those Plaintiff experienced, that they were not rectified, or that Defendant did not now intend to fully comply with the contract. There are no allegations that demonstrate Defendant had a fraudulent motive for entering into the contract.

Additionally, it is clear from Plaintiff's Complaint that Defendant never manifested a complete intent not to carry out the contract. On the contrary, Defendant undertook and completed most of its contractual obligations. Of the twenty-three states in which it was required to file returns, it timely filed in fourteen of them. (Compl. ¶ 23). Defendant collected and stored all the data it was obligated to store on its website per the terms of the contract. (*Id.* ¶ 18). Defendant only cut off service to Plaintiff in the eleventh month of its twelve-month obligation. (*Id.* ¶¶ 29-30). Partial performance is evidence that a party intended to fulfill at least some of its obligations. *See Krispy Kreme Doughnut Corp. v. Advantage Grp. Enter., Inc.*, No. 1:08-CV-0092, 2008 WL 5216227, at *4 (M.D.N.C. Dec. 11, 2008) (noting that the defendant's continued orders and business with the plaintiff "tended to disprove" that the defendant intended from the

11

start to not perform); *McKinnon v. CV Indus., Inc.*, 713 S.E.2d 495, 504 (N.C. Ct. App. 2011) ("[P]artial performance of the . . . [contract] . . . serves as evidence of [the defendant's] intent to fulfill the provisions . . . when it was formed.").

As such, Plaintiff does not allege the "something more" required to tack a fraudulent inducement claim onto what is instead a standard breach of contract. Defendant's Motion to Dismiss this claim will be granted.

### b. Plaintiff's UDTPA Claim

The Court now turns to Plaintiff's UDTPA claim under N.C. Gen. Stat. § 75-1.1, *et seq.* The UDTPA bars any "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1. To sustain a UDTPA claim, Plaintiff must show that: 1) Defendant committed an unfair or deceptive act or practice, or an unfair method of competition, that (2) was in or affecting commerce, which (3) proximately caused actual injury to it. *Spartan Leasing v. Pollard*, 400 S.E.2d 476, 482 (N.C. Ct. App. 1991). However, "[a] mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under the UDTPA." *Nike USA Inc. v. WDP Soccer Inc.*, No. 3:18-CV-374-RJC-DSC, 2018 WL 4289653, at *4 (W.D.N.C. Aug. 10, 2018), *report and recommendation adopted*, No. 3:18-CV-00374-RJC-DSC, 2018 WL 4283062 (W.D.N.C. Sept. 7, 2018) (citations omitted). Instead, "in the context of a contractual relationship, a party must allege '[e]gregious or aggravating circumstances' in addition to the underlying breach of contract." *Id.* (quoting *Ellis v. Louisiana-Pac. Corp.*, 699 F.3d 778, 787 (4th Cir. 2012)).

Plaintiff argues that its assertions of an "aggravated breach of contract" and of conversion both constitute aggravated circumstances under North Carolina law. (Pl.'s Br. at 20). The Court is unpersuaded. Several of the cases Plaintiff cites in support of its assertion of aggravated

12

circumstances are inapplicable. The UTDPA claim in *Williams v. Charlotte Copy Data, Inc.*,[4] and the plaintiff's UTDPA claim in *Swan Racing Co., LLC v. XXXtreme Motorsport, LLC*,[5] both were upheld on the back of *fraud*, not a different independent aggravating circumstance. (*See* Pl.'s Br. at 16-17). Because Plaintiff does not sufficiently allege fraud, the cases are inapposite.

Plaintiff could sustain this claim if it could show that the "conduct of the breaching party . . . is deceptive." *Poor v. Hill*, 530 S.E.2d 838, 845 (N.C. Ct. App. 2000). While "it is not necessary . . . to show fraud, bad faith, deliberate or knowing acts of deception, or actual deception, [the] plaintiff must, nevertheless, show that the acts complained of possessed the tendency or capacity to mislead, or created the likelihood of deception." *Overstreet v. Brookland, Inc.*, 279 S.E.2d 1, 7 (N.C. Ct. App. 1981). Plaintiff does not do so. Though similar to *Poor*, Plaintiff merely alleges that Defendant "attempted to raise the price of its services prior to the expiration" of the contract. (Compl. ¶ 28). Plaintiff does not allege that Defendant, after breaching the contract, continued to deceptively represent that it still abided by the terms. Nor does Plaintiff allege that the reason Defendant could not abide by the contract was because it instead secretly opted to pursue some other avenue. Nothing in Plaintiff's Complaint sufficiently alleges the deceptive conduct necessary to sustain a UTDPA claim separate from the breach of contract.

Though Plaintiff is correct that a conversion claim may constitute a UTDPA violation, it does not do so herein. As the court in *Swan Racing* makes clear, though "a conversion of property may constitute a deceptive and unfair trade practice in North Carolina, [it] does not automatically create an UDTPA claim as a matter of law." 2015 WL 4430257, at *5 (citation

---

[4] 591 S.E.2d 598 (N.C. Ct. App. 2004).
[5] No. 5:14-CV-155-RLV, 2015 WL 4430257 (W.D.N.C. July 20, 2015).

omitted). "A conversion must include sufficiently aggravating circumstances to elevate the conversion to an unfair and deceptive trade practice." *Id.* (quotations omitted).

In support of its position, Plaintiff points to the defendant's UDTPA counterclaim in *Swan Racing*. Indeed, the court in that case allowed the defendant's UDTPA claim to proceed on the back of conversion. This is where the similarities to the instant case end. In *Swan Racing*, (and in the case the court therein relies upon, *Love v. Pressley*[6]), the parties had entered into a lease agreement for real property. 2015 WL 4430257, at *6. After relations between the parties broke down, the plaintiff reentered the property and locked out the defendant, converting all of defendant's personal property stored on the premises. *Id.* The plaintiff then sold some of the property and refused any request from the defendant to return it. *Id.* The court allowed a UDTPA claim to survive dismissal, noting that beyond mere conversion, the plaintiff also "ostensibl[y] trespass[ed] and evict[ed the defendant] without judicial process," just as the landlord did in *Love*. *Id.* In both cases, trespass and non-judicial eviction were sufficient aggravating factors to elevate a standard conversion to a violation of the UDTPA.

Plaintiff's Complaint does not include any aggravating factors of the sort the court found important in *Swan Racing* or *Love*. As such, Plaintiff cannot sustain its UDTPA claim and it will be dismissed.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss Claims II and IV is hereby **GRANTED**.

Signed: July 25, 2019

Graham C. Mullen
United States District Judge

---

[6] 239 S.E.2d 574, 583 (N.C. Ct. App. 1977).